# EXHIBIT A

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA



**SECTION 10**

NO. 22 - 903                                    DIVISION

**MARGARET WATKINS WIFE OF/AND JAMES A. WATKINS INDIVIDUALLY AND ON BEHALF OF THEIR MINOR SONS JMW, RAW AND WJW**

**VERSUS**

**PLUM, PBC; NURTURE, INC.; HAIN CELESTIAL GROUP, INC.; AMAZON.COM SALES, INC.; WHOLE FOODS MARKET INC.; and SEWERAGE AND WATER BOARD OF NEW ORLEANS**

FILED: _____          _____

                                                    DEPUTY CLERK

**PETITION FOR DAMAGES**

NOW INTO COURT comes Margaret Watkins wife of/and James A. Watkins, persons of

the full age of majority and residents of and domiciled in the Parish of Orleans, State of

Louisiana, individually and on behalf of their minor sons (JMW (age 3), RAW (age 5) and WJW

(age 1) who with respect represent:

**INTRODUCTION**

1.

This case involves a group of manufacturers—namely Plum, PBC; Hain Celestial Group,

Inc.; and Nurture, Inc. ("Defendant Baby Food Manufacturers"); Amazon.com Sales, Inc. and

Whole Foods Market, Inc. ("Defendant Sellers"); and Sewerage and Water Board of New

Orleans ("SWB").

2.

Defendant Baby Food Manufacturers knowingly sold baby food products ("Baby Foods")

which contain dangerous levels of toxic heavy metals—mercury, lead, arsenic, and cadmium

(collectively "Toxic Heavy Metals"), which are all known to be severe neurotoxins. The toxic

exposure substantially contributed to Plaintiffs' son JMW's developing lifelong brain damage and

neurodevelopmental disorders. Plaintiffs' son JMW was diagnosed with Autism Spectrum

Disorder ("ASD") caused or substantially contributed to because he consumed poisonous Baby

Foods manufactured and sold by these Defendant Baby Food Manufacturers and Defendant

Sellers.

Indigent Legal Fee          $10.00   $10.00  $0.00
JSC                         $26.50   $26.50  $0.00
Supreme Court- Proc          $10.00   $10.00  $0.00
essing Fee
Additional Defendant        $141.00  $141.00  $0.00
s

CHELSEA H. POLLEN
CLERK, CIVIL DISTRICT COURT
421 LOYOLA AVENUE - ROOM 402
NEW ORLEANS, LA 70112
504 - 407 - 0000

Receipt Date          2/1/2022 2:50:00 PM
Receipt Number        383804
Register              CDC Cash Register 1
                      cgaughin
Case Number           2022 -00903

Amount Received   $657.50
Over Payment      $ 0.00
Payment/ Transaction List
Credit Card  # 078850 $657.50

Item              Charged   Paid    Bal
Petition for Damages  $444.50  $444.50  $0.00
Judicial College     $0.50   $0.50   $0.00
Building Fund Fee    $25.00  $25.00  $0.00

VERIFIED
2/1/22

3.

SWB is the municipal water source for Plaintiffs who have tested at high levels of a metabolite of a gasoline additive ETBE (2HIB) which is also a known neurotoxic chemical. Upon information and belief SWB should be aware of the contamination of its water source (the Mississippi River) with gasoline (there is an on-going investigation as to the source of this gasoline). JMW has tested at toxic levels for 2HIB.

4.

Defendant Baby Food Manufacturers' Baby Foods are laced with staggering amounts of Toxic Heavy Metals which recently made headlines following research and a Congressional investigation. In February 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform released a report containing shocking details of Defendants' tainted Baby Foods based on the submission of internal test results and company documents. Specifically, the Subcommittee found that Defendant Baby Food Manufacturers and Defendant Sellers sell Baby Foods containing as much as 180 parts per billion ("ppb") inorganic arsenic, 6441 ppb lead, 10 ppb mercury, and manufacture their Baby Foods using ingredients containing as much as 913.4 ppb arsenic, 886.9 ppb lead, and 344.55 ppb cadmium, far eclipsing domestic and international regulatory standards. By way of comparison, the U.S. Food and Drug Administration ("FDA") has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and 5 ppb cadmium, and the U.S. Environmental Protection Agency ("EPA") has capped the allowable level of mercury in drinking water at 2 ppb. With a chilling note the Subcommittee concluded that "[m]anufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever."

5.

The high levels of Toxic Heavy Metals found in Defendant Baby Food Manufacturers' and Defendant Sellers' Baby Foods are, in part, a function of the ingredients used by Defendant Baby Food Manufacturers to manufacture their Baby Foods, the setting of dangerously inflated internal limits which Defendant Baby Food Manufacturers willingly flouted, disregard of regulatory standards, and corporate policies which failed to test finished products before market distribution, purchase by unknowing parents, and consumption by vulnerable infants. Defendant Sellers advertise they monitor and dictate ingredients of the food products they sell, and thus,

should know of the heavy metal levels described herein. In fact, the Defendant Sellers continue to sell these defective products.

6.

Defendant Baby Food Manufacturers' and Defendant Sellers' malicious recklessness and callous disregard for human life has wreaked havoc on the health of countless vulnerable children, all so that they could maximize profits while deliberately misleading parents regarding the safety of their Baby Foods. Accordingly, this lawsuit will not only ensure that Plaintiffs are duly compensated for their tragic injuries and Defendants punished, but that future generations are protected from the poisonous products that Defendants pander as "food".

7.

Made Defendants herein are as follows:

A.  Defendant **Plum, PBC** ("Plum") is a citizen of Delaware and California with its principal place of business located at 1485 Park Avenue, Suite 200, Emeryville, California. Plum sells Baby Foods under the brand name Plum Organics. Plum's products are divided into groups according to the targeted infant or toddler age and/or type of food product. For example, there are five groups designated for the youngest infants: Stage 1 (4+ months old), Stage 2 (6+ months old), Stage 3 (6+ months old), "Super Puffs", and "Little Teethers". At all relevant times, Plum has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this Parish and State.

B.  Defendant **Nurture, Inc.** ("Nurture"), is a citizen of Delaware and New York with its principal place of business located at 40 Fulton St, 17th Floor, New York, NY 10038-1850. Nurture owns Happy Family Brands (including Happy Family Organics) and sells Baby Foods under the brand name HappyBaby. Nurture classifies its HappyBaby range of products according to three categories: "baby", "tot", and "mama". The "baby" category is comprised of foods, including "starting solids", intended for age groups 0-7+ months, the "tot" category covers 12+ months, and "mama" includes infant formulas for newborn babies. At all relevant times, Nurture has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of HappyBaby within this Parish and State.

C.  Defendant **Hain Celestial Group, Inc.** ("Hain") is a citizen of Delaware and New York with its principal place of business located at 1111 Marcus Ave., Lake Success, NY 11042. Hain sells Baby Foods under the brand name "Earth's Best Organics." Hain offers infant and baby formula and foods as well as toddler foods covering products from "organic infant cereal" to "organic snacks for toddlers and kids on the go." At all relevant times, Hain has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this judicial district.

D.  Defendant **Amazon.com Sales, Inc.** ("Amazon") is a citizen of Delaware and New York with its principal place of business located 410 Terry Avenue North, Seattle, WA 98109. Amazon is authorized to and doing business in this Parish and State. At all relevant times, Amazon has conducted business and derived substantial revenue from its

manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this State and Parish.

E.  Defendant **Whole Foods Market Inc.** ("Whole Foods") is an American multinational supermarket chain headquartered in Austin, Texas located at 550 Bowie St. Austin, TX, 78703-4644. At all relevant times, Whole Foods has conducted business and derived substantial revenue from its manufacturing, advertising, distributing, selling, and marketing of Baby Foods within this State and Parish.

F.  Defendant **Sewerage and Water Board of New Orleans** ("SWB") is a Louisiana political subdivision with its principal place of business at 625 St. Joseph Street New Orleans, LA 70165.

## JURISDICTION AND VENUE

8.

This Court has personal jurisdiction over all defendants pursuant to La. R.S. 13:3201 and La. C.C.P. art. 74 as all defendants maintain and carry on systematic and continuous contacts in this State, regularly transacts business within this State, and regularly avail themselves of the benefits of this State's laws.  Additionally, all injuries have been suffered in the Parish and State.

## FACTS

9.

On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report detailing its findings that Toxic Heavy Metals—including arsenic, cadmium, lead, and mercury—were present in "significant levels" in numerous commercial baby food products.  Four companies— Hain, Gerber, Nurture, and Beech-Nut —produced internal testing policies, test results for ingredients and finished products, and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits. Three companies—Plum, Walmart, and Sprout—refused to cooperate.

10.

The Subcommittee reported that the data submitted by the companies unequivocally revealed that a substantial number of Defendant Baby Food Manufacturers' and Defendant Sellers' finished products and/or ingredients used to manufacture the Baby Foods are tainted with significant levels of Toxic Heavy Metals, namely inorganic arsenic, lead, cadmium, and mercury.

11.

Specifically, the Subcommittee concluded that:

ARSENIC was present in baby foods made by all responding companies:

a. Nurture (HappyBABY) sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.

c. Hain (Earth's Best Organic) sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic.

LEAD was present in baby foods made by all responding companies:

a. Nurture (HappyBABY) sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead.

b. Hain (Earth's Best Organic) used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.

CADMIUM was present in baby foods made by all responding companies:

a. Hain (Earth's Best Organic) used 102 ingredients in its baby food that tested over 20 ppb cadmium. Some tested much higher, up to 260 ppb cadmium.

b. Sixty-five percent of Nurture (HappyBABY) finished baby food products contained more than 5 ppb cadmium.

MERCURY:

a. Nurture (HappyBABY) sold finished baby food products containing as much as 10 ppb mercury.

b. Hain (Earth's Best Organic does not even test for mercury in baby food. However, independent testing by an alliance of nonprofit organizations, scientists and donors named "Happy Babies Bright Futures" ("HBBF") of Hain's Baby Foods confirm that Hain's products contain as much as 2.4 ppb of mercury.

12.

These levels greatly surpass the limits allowed by U.S. regulatory agencies. Upon information and belief, there are no FDA regulations governing the presence of Toxic Heavy Metals in Baby Foods specifically; to the extent such regulations exist, the quantities of Toxic Heavy Metals in Defendant Baby Food Manufacturers' Baby Foods far exceed any permissible FDA levels. To be sure, the FDA has set the maximum contaminant levels ("MCL") in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and 5 ppb cadmium, and the EPA has capped the allowable level of mercury in drinking water at 2 ppb. However, these limits were created in reference to adult exposure, not infants. Compared to these thresholds, the test results of the Defendant Baby Food Manufacturers' Baby Foods and their ingredients are 91 times (903 ppb) greater than permitted arsenic levels, 177 times (881 ppb) greater than permitted lead levels, 70

times (339 ppb) greater than permitted cadmium levels, and 5 times (8 ppb) greater than permitted mercury levels.

13.

Moreover, compounding these troubling findings, the Defendant Baby Food Manufacturers set internal limits for the presence of Toxic Heavy Metals in their foods that were, themselves, dangerously high and then routinely failed to abide by those inadequate standards. For example, the Subcommittee found that Hain (Earth's Best Organic) set an internal standard of 200 ppb for arsenic, lead, and cadmium in some of its ingredients. But Hain routinely exceeded its internal policies, using ingredients containing 353 ppb lead and 309 ppb arsenic. Hain justified these deviations based on "theoretical calculations," even after Hain admitted to the FDA that its testing underestimated final product toxic heavy metal levels.

14.

As found by the Subcommittee, Defendant Baby Food Manufacturers have willfully sold—and continue to sell—contaminated Baby Foods notwithstanding their full awareness of these unacceptably high levels of Toxic Heavy Metals in their products. In August 2019, Hain held a closed-door meeting with the FDA during which Hain delivered a presentation to the agency acknowledging the Toxic Heavy Metal problem in its Baby Food. In the PowerPoint slides presented during the meeting— only made public by the Subcommittee—Hain confirmed that some of the ingredients in its Baby Food contain as much as between 108 to 129 ppb of arsenic, specifically noting "[p]reliminary investigation indicates Vitamin/Mineral Pre-Mix may be a major contributing factor" Additionally, the presentation revealed that:

    a. Hain's corporate policy to test only ingredients, not final products, underrepresents the levels of toxic heavy metals in baby foods. In 100% of the Hain baby foods tested, inorganic arsenic levels were higher in the finished baby food than the company estimated they would be based on individual ingredient testing. Inorganic arsenic was between 28% and 93% higher in the finished products;

    b. Many of Hain's baby foods were tainted with high levels of inorganic arsenic—half of its brown rice baby foods contained over 100 ppb inorganic arsenic; its average brown rice baby food contained 97.62 ppb inorganic arsenic; and

    c. Naturally occurring toxic heavy metals may not be the only problem causing the unsafe levels of toxic heavy metals in baby foods; rather, baby food producers like Hain may be adding ingredients that have high levels of toxic heavy metals into their products, such as vitamin/mineral pre-mix.

15.

Moreover, although Plum refused to cooperate with the Subcommittee's investigation, independent testing data confirms that the Baby Food of Plum is similarly tainted.

16.

Instead of producing any substantive information, Plum provided the Subcommittee with a self-serving spreadsheet declaring that every one of its products "meets criteria" while declining to state what the criteria were. Plum's disingenuous testing summary speaks volumes since the summary does not show the levels of Toxic Heavy Metals that the testing found or the levels that would "meet criteria." Disturbingly, Plum admitted that, for mercury (a powerful neurotoxin), the company has no criterion whatsoever, stating: "No specific threshold established because no high-risk ingredients are used." However, despite Plum having no mercury threshold, it still marked every food as "meets criteria" for mercury. The Subcommittee noted that "[t]his misleading framing—of meeting criteria that do not exist—raises questions about what [Plum's] other thresholds actually are, and whether they exist."

17.

Autism spectrum disorder ("ASD") is a developmental disability that can cause significant social, communication and behavioral challenges, particularly for children diagnosed with the disorder. ASD includes conditions that were previously considered separate—autism, Asperger's syndrome, childhood disintegrative disorder, and an unspecified form of pervasive developmental disorder. The CDC estimates that, as of 2016, 1 in 54 U.S. children have ASD.

18.

There is often nothing about how individuals with ASD look that sets them apart from other people, but those with ASD may communicate, interact, behave, and learn in ways that are different from most other people. The learning, thinking, and problem-solving abilities of people with ASD can range from gifted to severely challenged. Many people with ASD require substantial support in their daily lives, many children with ASD have difficulty learning, and some have signs of lower-than-normal intelligence.

19.

A child with ASD may have problems with social interaction and communication skills: a. Fails to respond to his or her name or appears not to hear others; b. Resists cuddling and holding, and seems to prefer playing alone, retreating into his or her own world; c. Has poor eye contact and lacks facial expression; d. Does not speak or has delayed speech, or loses previous ability to say words or sentences; e. Cannot start a conversation or keep one going, or only starts one to make requests or label items; f. Speaks with an abnormal tone or rhythm and may use a singsong voice or robot-like speech; g. Repeats words or phrases verbatim, but does not

understand how to use them; h. Does not appear to understand simple questions or directions; i. Does not express emotions or feelings and appears unaware of others' feelings; j. Does not point at or bring objects to share interest; k. Inappropriately approaches a social interaction by being passive, aggressive or disruptive; l. Has difficulty recognizing nonverbal cues, such as interpreting other people's facial expressions, body postures or tone of voice.

20.

Many children with ASD continue to have difficulty with language and social skills throughout the course of their lives, and the teen years can bring worse behavioral and emotional problems which may impose severe limitations to their quality of life.

21.

Some children show signs of ASD in early infancy, such as reduced eye contact, lack of response to their name or indifference to caregivers. Other children may develop normally for the first few months or years of life, but then suddenly become withdrawn or aggressive or lose language skills they have acquired.

22.

Environmental factors—such as exposure to Toxic Heavy Metals—have been found to play a key role in the development of ASD, with the CDC, Mayo Clinic and NIH all recognizing early life exposure to environmental toxins (such as lead) as risk factors for ASD.[1]

23.

According to the World Health Organization ("WHO"), Toxic Heavy Metals, specifically arsenic, cadmium, lead, and mercury, pose a "major public health concern" for children. The Occupational Safety and Health Administration ("OSHA") has warned that these metals "may build up in biological systems and become a significant health hazard." Indeed, the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry ("ATSDR") ranks arsenic as number one among substances present in the environment that pose the most

---

[1] Mayo Clinic, Autism spectrum disorder, available at:
https://www.mayoclinic.org/diseasesconditions/autism-spectrum-disorder/symptoms-causes/syc-20352928; CDC, What is Autism Spectrum Disorder?, available at:
https://www.cdc.gov/ncbddd/autism/facts.html; NIH, Autism Spectrum Disorder Fact Sheet, available at: https://www.ninds.nih.gov/Disorders/Patient-CaregiverEducation/Fact-Sheets/Autism-Spectrum-Disorder-Fact-Sheet

significant potential threat to human health, followed by lead (second), mercury (third), and cadmium (seventh).

24.

The threat presented by Toxic Heavy Metals to children's health is widely shared by the global scientific community. As one recent study observed, "[t]he implications of heavy metals with regards to children's health have been noted to be more severe compared to adults. The elements' harmful consequences on children health include mental retardation, neurocognitive disorders, behavioral disorders, respiratory problems, cancer and cardiovascular diseases. Much attention should be given to heavy metals because of their high toxicity potential, widespread use, and prevalence." Children and, even more so, babies have higher exposure to metals compared to adults because they consume more food in relation to their body weight and absorb metals more readily than adults by 40 to 90%. The mechanisms needed to metabolize and eliminate heavy metals are comparatively undeveloped in childhood, with babies having weaker detoxifying mechanisms and poorer immune systems than adults.[2] For example, liver pathways that in adulthood metabolize absorbed arsenic do not mature until mid-childhood; un-excreted arsenic thus continues to circulate and is deposited in other organs. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health effects, "[n]o level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants." Thus, "the major windows of developmental vulnerability occur during infancy and early childhood due to continuing brain development after birth." In short, even small amounts of exposure to Toxic Heavy Metals can have devastating health outcomes for babies and children.

25.

Multiple studies, reviews, and meta-analyses conducted throughout various parts of the world over the last decade have consistently observed a positive association between exposure to Toxic Heavy Metals and the development of ASD in children and infant populations.

26.

In 2019, researchers at the University of Buffalo conducted a systematic review and meta-analysis of relevant published research on the association between children's exposure to

---

[2] Testing of JMW indicates he does not process toxins as well as a "normal" child allowing a build up of toxins in his body which exacerbates the damage toxins such as Heavy Metals can cause.

inorganic arsenic and ASD. The meta-analysis concluded that there is consistent evidence supporting a positive association between early life inorganic arsenic exposure and diagnosis of ASD, with the authors noting that "it is in the best interest of policy makers and the public to reduce exposures to [arsenic] among pregnant women and children."

27.

Similar results were observed in another systematic review and meta-analysis published in 2020 by researchers at the State University of New York. This follow-up meta-analysis investigated the association of exposure to cadmium, mercury, and aluminum and ASD. The authors stated that they selected these metals "because they are abundant in our environment, are known to cause neurological problems in humans, and have multiple published studies examining their potential links with ASD." Specifically, the meta-analysis reviewed 18 studies on cadmium and 23 studies on mercury. When the studies were integrated into the analysis, the authors found significant associations between all the metals and ASD. Notably, levels of mercury in hair, urine and blood were all positively associated with ASD. Overall, the authors concluded, "these findings support policies that advocate limiting exposure to neurotoxic metals, particularly for pregnant women and young children, in order to help reduce the rising incidence of ASD."

28.

An earlier meta-analysis from 2014 similarly concluded that environmental exposures to mercury in early infancy were significantly associated—almost a doubling of the risk—with the development of ASD. Notably, the authors found that the summary odds ratios (risk of disease) were similar after excluding studies not adjusted for confounders.

29.

Similarly, a 2018 Chinese study observed that children with ASD had significantly higher levels of mercury and arsenic in their blood compared with healthy controls. The authors proceeded to note "[t]he results of this study are consistent with numerous previous studies, supporting an important role for heavy exposure, particularly mercury, in the etiology of ASD."

30.

A 2017 longitudinal cohort study of Korean children measured the levels of mercury in the blood of children at ages 2 and 3. The study authors observed elevated mercury levels in the blood of young children who were later diagnosed with ASD. Indeed, this study was specifically

cited by the Subcommittee for the proposition that Toxic Heavy Metals increase the risk of autistic behaviors in pre-school children.

31.

In 2016, a multidisciplinary team comprised of researchers from the University of Texas, University of Utah, Johns Hopkins, University of South Florida, University of Alabama, and Rutgers University analyzed data on 4,486 children with ASD residing in 2,489 census tracts in five sites of the Centers for Disease Control and Prevention's Autism and Developmental Disabilities Monitoring ("ADDM") Network to assess whether ambient lead, mercury, and arsenic concentrations were associated with ASD prevalence. Notably, as well as observing an association between ambient lead concentrations and ASD prevalence, the results demonstrated that exposure to multiple metals may have synergistic effects on ASD prevalence. This is significant because children consuming Defendants' Baby Foods are exposed to repeated, high doses of multiple Toxic Heavy Metals, thereby compounding the risk of ASD. Indeed, recent research indicates that mercury has a threshold effect (the minimum dose of exposure prior to onset of disease) of greater than 15 ppb for the risk of ASD to manifest in an child, with one paper concluding that "[t]he weight of scientific evidence supports [mercury] as a causal factor in subjects diagnosed with an ASD." Indeed, the available literature consistently observes a dose-response relationship between exposure to Toxic Heavy Metals and ASD, with increased dose resulting in more severe forms of ASD.

32.

Moreover, a 2015 study of lead and mercury levels in the bodies of Egyptian children concluded that the mean levels of mercury and lead in the hair of children diagnosed with autism were significantly higher than controls. The authors specifically noted that "[e]nvironmental exposure to these toxic heavy metals, at key times in development, may play a causal role in autism."

33.

A 2013 U.S. study investigated both the level of Toxic Heavy Metals in children with ASD and the possible association of the metals with ASD severity. 55 children with autism at ages 5-16 were compared to 44 controls with similar age and gender. After measuring Toxic Heavy Metals in whole blood, red blood cells and urine, the authors observed that the autism group had higher levels of lead in red blood cells and higher urinary levels of lead. A stepwise,

multiple linear regression analysis found a strong association of levels of Toxic Heavy Metals with variation in the degree of severity of autism for all the severity scales. Cadmium (whole blood) and mercury (whole blood and RBC) were the most consistently significant variables. The authors concluded that overall, children with autism have higher average levels of several Toxic Heavy Metals, and levels of several Toxic Heavy Metals are strongly associated with variations in the severity of autism.

34.

In sum, the heavy weight of the literature, as supported by meta-analyses, multiple studies employing varying methodologies and conducted in various countries, strongly supports a causal relationship between exposure to Toxic Heavy Metals and the development of ASD in children.

35.

During all relevant times (March 2017 to February 2021), Defendant Baby Food Manufacturers and Defendant Sellers manufactured and/or sold Baby Foods in the United States, the weight of evidence showed that the Baby Foods exposed babies and children to unsafe levels of Toxic Heavy Metals. Despite this knowledge, Defendant Baby Food Manufacturers and Defendant Sellers failed to disclose this risk to consumers through any means.

36.

As discussed above, both independent testing, Defendant Baby Food Manufacturers' internal evaluations of their Baby Food, and Defendant Baby Food Manufacturers' representations and disclosures to the Subcommittee and FDA reveal the presence of substantial amounts of Toxic Heavy Metals in Defendant Baby Food Manufacturers' products. As such, Defendant Baby Food Manufacturers as well as Defendant Sellers knew or should have known that their Baby Foods contain dangerous of Toxic Heavy Metals.

37.

Indeed, independent testing performed in early 2019 demonstrated elevated amounts of such Toxic Heavy Metals in Baby Food products on the U.S. market, and the HBBF Report further confirmed such contamination of Defendants' Baby Food. And, as the Subcommittee found, Defendant Baby Food Manufacturers and Defendant Sellers continued to sell their Baby Food even after testing of both ingredients and finished products revealed the presence of substantial amounts of Toxic Heavy Metals.

38.

Moreover, the scientific literature on the dangers of Toxic Heavy Metals—particularly as it relates to adverse effects on the neurodevelopment of children—have been well known for decades. Defendants, as manufacturers of Baby Foods, are held to the standard of experts responsible for keeping abreast of the latest scientific developments related to the dangers of contaminants in their products. Defendants failed to act in protecting vulnerable children from exposure to the Toxic Heavy Metals in their foods and, thus, subjected them to the risk of developing neurodevelopmental disorders such as ASD.

39.

To be clear, Defendant Baby Food Manufacturers can manufacture Baby Foods that do not pose such a dangerous risk to the health of infants and children by using alternative ingredients, not adding certain pre-mix minerals and vitamins high in Toxic Heavy Metals, or sampling their ingredients from other sources, as specifically acknowledged by Hain in its August 2019 presentation to the FDA: "Explore alternatives for Brown Rice ingredient to reduce risk." At the very least, Defendant Baby Food Manufacturers, as well as Defendant Sellers, were under a duty to warn unsuspecting parents of the presence of Toxic Heavy Metals in their Baby Foods. However, these defendants took no action, continued to sell their products with full knowledge of the risks posed by their Baby Foods, and misled consumers regarding the safety of their products, all to the harm of children.

40.

According to internal company documents, Nurture sells products even after testing confirms that they are dangerously high in inorganic arsenic. Nurture sold one such product, Apple and Broccoli Puffs, despite tests results showing it contained 180 ppb inorganic arsenic. An arsenic level of 180 ppb is high by all standards, but it is 80% higher than Nurture's own internal goal threshold of 100 ppb. Nurture routinely sold products that exceeded its internal standards. Twenty-nine other products that Nurture tested and sold registered over 100 ppb inorganic arsenic. In total, over 25% of the products that Nurture tested for inorganic arsenic, and sold, had inorganic arsenic levels above 100 ppb.

41.

Moreover, Nurture sold products that tested as high as 641 ppb lead—over six times higher than its internal limit of 100 ppb lead. Nurture also sold five other products after they tested over 50 ppb lead. Of the 206 finished products that Nurture tested for lead, 16 products

registered over 20 ppb lead—exceeding the EU standard, and 39 products, or 18.9%, tested over 10 ppb lead. It is not clear that even one of Nurture's baby food products registered at or below 1 ppb lead, which should be the upper limit for lead content according to health experts at Consumer Reports, the Environmental Defense Fund, and the American Academy of Pediatrics. The average amount of inorganic arsenic in the baby foods that Nurture tested and sold was 59.54 ppb. That towers over existing and recommended standards, including FDA's and EPA's water limits of 10 ppb. At least 89 of Nurture's final products—over 78% of those products tested—tested at 9 ppb inorganic arsenic or above. For results under 9.54 ppb, Nurture did not differentiate—it marked them all as "<9.54" Because of this "less than" reporting format, there is no way to confirm if any of Nurture's products were free of inorganic arsenic. Nurture sold multi-grain cereal with 49 ppb cadmium;125 products that tested over 5 ppb, which is the EPA's limit for drinking water; a finished baby food product that contained 10 ppb mercury; and two others that contained 9.8 and 7.3 ppb. A level of 10 ppb is five times more than the EPA's 2 ppb standard for drinking water. In total, Nurture sold 56 products that contained over 2 ppb mercury.

42.

Nurture created internal standards but did not follow them. Nurture describes these standards as "goal thresholds" that "are not used to make product disposition decisions and are not a precondition to product release." Instead, its testing regime is limited to monitoring the supply chain as opposed to ensuring that babies are not exposed to Toxic Heavy Metals. Nurture's thresholds are not actually used to prevent products that contain high levels of toxic heavy metals from being sold.

43.

Nurture does not even claim to be testing for safety. In its letter response to the Subcommittee, Nurture stated: "our heavy metal testing is performed as part of our monitoring program and not as a condition of product release, all of the products that were tested were sold into commerce." Nurture sells the products it tests, regardless of their toxic heavy metal content. In total, Nurture tested 113 final products and sold every product tested, regardless of how much inorganic arsenic or lead the product contained, and regardless of whether those metals exceeded its own internal standards. As a result of this policy of not testing for safety, Nurture released products containing as much as 641 ppb lead and 180 ppb inorganic arsenic. Nurture sold 29

products that were above its internal arsenic limit of 100 ppb, including Apple & Broccoli Puffs that contained 180 ppb inorganic arsenic.

44.

Hain does not regularly test finished baby food products for inorganic arsenic content. It typically only tests ingredients. However, when Hain did test a small sample of finished product, it found 129 ppb inorganic arsenic. In August 2019, Hain presented the results of its testing to the FDA in a closed-door meeting. During the presentation, Hain stated that its brown rice flour and vitamin premix contained high amounts of Toxic Heavy Metals, specifically noting that "preliminary investigation indicates Vitamin/Mineral Pre-Mix may be a major contributing factor." Indeed, this was later confirmed by Hain's internal test results produced to the Subcommittee, which showed that its rice flour had tested at 309 ppb arsenic; vitamin pre-mix at 223 ppb arsenic, and raisin and wheat flour containing 200 ppb arsenic. To be clear, Hain continued using these toxic ingredients even months after it had informed the FDA regarding its findings, as demonstrated by the later testing produced to the Subcommittee. The testing data also shows that Hain used at least 24 ingredients after testing found that they contained more than 100 ppb arsenic, its already-dangerously-high internal standard for most ingredients.

45.

Hain used six ingredients that tested above 200 ppb lead; 88 ingredients with lead levels at or over 20 ppb—the EU's standard for lead in infant formula;115 ingredients that registered at or over 15 ppb—EPA's action level for drinking water; and at least 27% of Hain ingredients tested at or over 5 ppb lead, FDA's standard for lead in bottled water. None of the test results showed an ingredient below 1 ppb lead, the upper limit for lead content. Hain used 14 ingredients that contained more than 100 ppb cadmium, including barley flour that registered at 260 ppb cadmium. That is thirteen times the EU's upper limit on cadmium in baby food. Hain also tested and used 102 ingredients that registered at or above 20 ppb cadmium. Hain does not test its ingredients or finished products for mercury.

46.

Hain set an internal standard of 200 ppb arsenic for 12 ingredients, most of which were different kinds of flours. By setting this high internal standard, Hain justified accepting wheat flour and rice that contained between 200 ppb and 150 ppb arsenic. Similarly, Hain set an internal limit of 200 ppb for lead in five ingredients—forty times higher than FDA's guidance

for bottled water. By doing so, Hain justified accepting lentil flour with 110 ppb lead and quinoa flour with 120 ppb lead. These surpass every existing regulatory standard for lead. Hain used four products that surpassed its internal toxic heavy metal limits. For example, it accepted cinnamon that contained 102 ppb cadmium, vitamin pre-mix that had 223 ppb arsenic and 353 ppb lead, and two rice flours that had 134 ppb and 309 ppb arsenic. Hain justified these variations by claiming that the "theoretical" final goods will not surpass its internal limits. In another example, Hain became aware that the vitamin pre-mix contained 223 ppb arsenic and 352 ppb lead. And yet, despite having dangerously high levels of toxic heavy metals, Hain approved the use of this vitamin pre-mix based on a "theoretical" calculation of toxic heavy metals in the final good.

47.

To calculate the estimated quantity of lead and arsenic in the finished good, Hain considered the percentage of rice flour and vitamin pre-mix in the finished goods, and their projected amounts of arsenic and lead. Ultimately, Hain predicted that the finished good would have roughly 85 ppb arsenic and 25 ppb lead. However, Hain never tested the finished product. Hain appears to have used this vitamin pre-mix with dangerously high levels of toxic heavy metals without ever confirming the finished good was actually safe to consume. Hain made this decision four months after it had made a secret presentation to FDA admitting that heavily tainted vitamin premix caused dangerous levels of arsenic in its finished products, which initially went undetected because Hain did not test its finished products. Hain made no effort to correct the problem.

48.

As discussed above, although Plum did not cooperate with the Subcommittee's investigation, the independent test results from HBBF's Report confirm that Plum sold Baby Foods with substantial levels of Toxic Heavy Metals, and accordingly knew or should have known about the risk presented by such metals. As noted by the Subcommittee, the fact that these companies refused to produce testing results, internal company documents, or specific testing standards, strongly suggests that these companies "might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products."

49.

Indeed, even the limited testing conducted by HBBF demonstrates that Plum acted out of callous disregard for human—specifically children's—health by selling Baby Foods contaminated with substantial amounts of Toxic Heavy Metals. Plum refused to produce testing standards and the Subcommittee noted that Plum "has hidden its policies and the actual level of toxic heavy metals in its products." The self-serving spreadsheet produced by Plum wherein it declares, without any data, that its products "meet criteria" (without identifying which criteria), poses more questions than it answers. Indeed, Plum has admitted that that it does not have a "specific threshold" established for the powerful neurotoxin mercury because "no high-risk ingredients are used." As well as evincing Plum's reckless disregard for the safety of children by refusing to establish a threshold for a toxin as dangerous as mercury, the statement is also outright false. The limited testing performed by HBBF reveals that Plum's "Little Teethers Organic Multigrain Teething Wafers—Banana with Pumpkin" intended for crawling babies contains 0.726 ppb mercury, and Plum's "Apple, Raisin, & Quinoa Organic Baby Food" contain 0.145 ppb mercury, flatly contradicting Plum's assertion that none of its products contain mercury.

50.

Although discovery will flesh out the full extent to which Plum and Sprout's Baby Foods are tainted with Toxic Heavy Metals, it is abundantly clear that these Defendants are no less culpable in its wrongdoing than its competitors who provided data to the Subcommittee.

**PLAINTIFF-SPECIFIC ALLEGATIONS**

51.

Plaintiff JMW almost exclusively consumed Baby Foods manufactured by Plum, Hain, and Nurture and sold by Amazon and Whole Foods to Plaintiff JMW's parents from August of 2018 to February 4, 2021 when James and Margaret Watkins first became aware of the heavy metal contents of these baby foods.[3] Plaintiff RAW also consumed (beginning March 2017), to a lesser degree, Baby Foods manufactured by Plum, Hain, and Nurture and sold by Amazon and Whole Foods to his parents.

---

[3] Plaintiffs have their entire purchase history from Amazon.com. Whole Foods has removed the ability to obtain the purchase history on-line but it is believed that entire purchase history is available from Whole Foods.

52.

Upon information and belief, the baby foods consumed by Plaintiffs JMW and RAW were contaminated with substantial quantities of Toxic Heavy Metals, exceeding that of existing regulatory limits and basic human decency.

53.

As a direct and proximate result of consuming Defendant Baby Food Manufacturers' Baby Foods, Plaintiffs JMW and RAW were physically and mentally damaged causing, or substantially contributing to, a diagnosis of ASD, level one in April of 2021 for JMW and the need for occupational therapy for RAW.

54.

Based on prevailing scientific evidence, exposure to the Toxic Heavy Metals at the levels contained in Defendant Baby Food Manufacturers' Baby Foods can cause or substantially contribute to ASD in humans.

55.

However, there is no dispute exposure to arsenic at the levels contained in Defendant Baby Food Manufacturers' Baby Foods causes brain and organ damage in an infant by damaging the mitochondria, and even more so in a child such as JMW who cannot process toxins as well as other children.

56.

Had any Defendant Baby Food Manufacturers and/or Defendant Sellers warned Plaintiffs JMW's and RAW's parents that these Defendants' Baby Foods could lead to exposure to Toxic Heavy Metals or, in turn, ASD, Plaintiffs RAW and JMW would not have consumed the Baby Foods. In fact, the moment these facts were discovered on February 4, 2021 by JMW's parents, he and RAW immediately ceased consuming these products.

57.

As a direct and proximate result of Plaintiffs' consumption of Baby Foods supplied and distributed by Defendant Baby Food Manufacturers and/or Defendant Sellers, Plaintiffs suffered significant harm, conscious pain and suffering, physical injury and bodily impairment including, but not limited to ASD and other sequelae.

58.

After discovering the baby food their children consumed was tainted with significant levels of heavy metals and JMW's diagnosis with ASD, James and Margaret Watkins did

extensive testing to uncover potential sources of toxins and other potential causes of JMW's ASD. These tests included hair testing for heavy metals (JMW has never had his hair cut) as well as physical and environmental toxin testing. JMW showed chronic exposure levels for both arsenic and lead as well as a very high 2HIB level (over 27,000 ug/g).

59.

2HIB is a metabolite found in urine which indicates exposure to a gasoline additives ETBE or MTBE. Subsequent testing of the rest of the family indicated exposure by the entire family as well as JMW's genetic disposition to have a difficult time processing toxins such as heavy metals allowing them to accumulate in his body (JMW and RAW's parents tested positive for 2HIB at approximately 4600 ug/g and 4700 ug/g while RAW tested at approximately 7700 ug/g compared to JMW's approximately 27,000 ug/g). The SWB water was the ONLY source of contamination possible and so the water was tested for over 40 toxins including MTBE and ETBE and as of this filing the results are pending. Normal 2HIB ranges from 0-200 as ETBE and MTBE is processed by the body within approximately one day.

60.

Upon information and belief the New Orleans municipal water system operated by SWB has been, and continues to be, contaminated with finished gasoline including ETBE (MTBE has been phased out and replaced with ETBE). However, MTBE is still manufactured in the US and sold overseas.

61.

Exposure to MTBE has been demonstrated to cause hepatic, kidney, and central nervous system toxicity, peripheral neurotoxicity, and cancer in animals. Because ETBE and MTBE are similar compounds which result in the same metabolite, ETBE is likely to be similarly toxic.

**CAUSES OF ACTION COUNT I: PRODUCTS LIABILITY – FAILURE TO WARN**

62.

Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

63.

At all relevant times, Defendant Baby Food Manufacturers engaged in the business of researching, testing, developing, designing, manufacturing, labeling, marketing, selling, inspecting, distributing, and promoting Baby Foods, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or

instructions concerning the dangerous characteristics of Baby Foods and Toxic Heavy Metals present when leaving their control. These actions were under the ultimate control and supervision of Defendant Baby Food Manufacturers. At all relevant times, Defendant Baby Food Manufacturers registered, researched, manufactured, distributed, marketed, and sold Baby Foods aimed at a consumer market.

64.

Defendant Baby Food Manufacturers researched, tested, developed, designed, manufactured, labeled, marketed, sold, inspected, distributed, and promoted, and otherwise released into the stream of commerce their Baby Foods, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs, and therefore had a duty to warn of the risks associated with the consumption of Baby Foods.

65.

At all relevant times, Defendant Baby Food Manufacturers had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, and distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Baby Foods did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendant Baby Food Manufacturers had a continuing duty to warn Plaintiffs of dangers associated with Baby Foods. Defendant Baby Food Manufacturers as a manufacturer, are held to the knowledge of an expert in the field.

66.

At the time of manufacture, Defendant Baby Food Manufacturers could have provided the warnings or instructions regarding the full and complete risks of Baby Foods because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products. Some elements of said warnings might include: "WARNING: **Do not feed to any child due** to presence of heavy metals which have been shown to cause neurological injury including ASD."

67.

At all relevant times, Defendant Baby Food Manufacturers failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendant Baby Food Manufacturers' Baby Foods.

68.

Even though Defendant Baby Food Manufacturers knew or should have known that their Baby Foods posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure to the products. The dangerous propensities of their products and the neurotoxic characteristic of Toxic Heavy Metals contained in Defendant Baby Food Manufacturers' Baby Foods, as described above, were known, or scientifically knowable to Defendant Baby Food Manufacturers through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as the Plaintiffs. The product warnings for Baby Foods in effect during the time period Plaintiffs consumed Baby Foods were vague, incomplete or otherwise inadequate, both substantively and graphically, to alert consumers to the severe health risks associated with Baby Food Manufacturers' Baby Foods consumption.

69.

Defendant Baby Food Manufacturers knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein. Defendant Baby Food Manufacturers failed to adequately warn or instruct consumers, i.e., the reasonably foreseeable users, of the risks of exposure to their products. Defendant Baby Food Manufacturers failed to warn and have wrongfully concealed information concerning the dangerous level of Toxic Heavy Metals in their Baby Foods and the potential for consumed Baby Foods to expose children to Toxic Heavy Metals, and further, have made false and/or misleading statements concerning the safety of Baby Foods.

70.

At all relevant times, Defendant Baby Food Manufacturers' Baby Foods reached the intended consumers, handlers, and users or other persons coming into contact with these products, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

71.

Plaintiffs JMW and RAW were exposed to Defendant Baby Food Manufacturers' Baby Foods without knowledge of their dangerous characteristics.

72.

At all relevant times, Plaintiffs JMW and RAW were exposed to Defendant Baby Food Manufacturers' Baby Foods while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

73.

Plaintiffs could not have reasonably discovered the defects and risks associated with Baby Foods prior to or at the time of Plaintiffs consuming Baby Foods. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant Baby Food Manufacturers and Defendant Sellers to know about and disclose serious health risks associated with using Defendant Baby Food Manufacturers' products.

74.

Defendant Baby Food Manufacturers knew or should have known that the information disseminated with their Baby Foods were inadequate, failed to communicate adequate information on the dangers of its consumption, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

75.

The information that Defendant Baby Food Manufacturers did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to avoid consuming the products. Instead, Defendant Baby Food Manufacturers disseminated information that was inaccurate, false, and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Baby Foods; continued to aggressively promote the safety of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of consuming Baby Foods.

76.

This alleged failure to warn is not limited to the information contained on Baby Foods labeling. The Defendant Baby Food Manufacturers were able to comply with relevant state law by disclosing the known risks associated with Baby Foods through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information

sources. But the Defendant Baby Food Manufacturers did not disclose these known risks through any medium.

77.

Had Defendant Baby Food Manufacturers provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Baby Foods, Plaintiffs could have avoided the risk of developing injuries and could have obtained or used alternative products.

78.

The Defendant Baby Food Manufacturers' lack of adequate warnings and instructions accompanying their Baby Foods were a substantial factor in causing Plaintiffs' injuries.

79.

As a direct and proximate result of the Defendant Baby Food Manufacturers' failure to provide an adequate warning of the risks of Baby Foods, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to past and future medical expenses, lost income, and other damages.

**COUNT II: PRODUCTS LIABILITY – DESIGN DEFECT**

80.

Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

81.

At all times herein mentioned, Defendant Baby Food Manufacturers designed, manufactured, tested, marketed, sold, handled, and distributed the Baby Foods consumed by Plaintiffs. These actions were under the ultimate control and supervision of Defendant Baby Food Manufacturers.

82.

At all relevant times, Defendant Baby Food Manufacturers' Baby Food products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by, or exposure to, infants and babies, including Plaintiffs JMW and RAW.

83.

Defendant Baby Food Manufacturers' Baby Food products as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed were defective in design and formulation in that, when they were placed into the stream of commerce, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

84.

Defendant Baby Food Manufacturer' Baby Food products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant Baby Food Manufacturers and/or Defendant Sellers were defective in design and formulation in that, when they left the control of Defendant Baby Food Manufacturers the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

85.

At all relevant times, the Baby Food products consumed by Plaintiffs JMW and RAW were expected to and did reach Plaintiffs without a substantial change in condition as manufactured, handled, distributed, and sold by Defendant Baby Food Manufacturers.

86.

At all relevant times, Defendant Baby Food Manufacturers knew or had reason to know that their Baby Food products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendant Baby Food Manufacturers.

87.

Therefore, at all relevant times, Defendant Baby Food Manufacturers' Baby Food products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendant Baby Food Manufacturers' Baby Food products were unreasonably dangerous in that they were hazardous and posed a grave risk of neurodevelopmental disorders—specifically ASD—when used in a reasonably anticipated manner due to the substantial quantities of Toxic Heavy Metals in the Baby Foods which could have been reduced or eliminated by sourcing ingredients/supplements with no or limited heavy metal contents, and/or preparing the Baby Food in a different manner to reduce or eliminate the heavy metals, for example, par-boiling the rice reduces the arsenic levels by 80%.

b. When placed in the stream of commerce, Defendant Baby Food Manufacturers' Baby Food products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

c. Defendant Baby Food Manufacturers did not sufficiently test, investigate, or study their Baby Food products;

d. Exposure to the Toxic Heavy Metals in Defendant Baby Food Manufacturers' Baby Food products presents a risk of harmful effects that substantially outweigh any potential utility stemming from their use;

e. Defendant Baby Food Manufacturers knew or should have known at the time of marketing Baby Food products that exposure to their Baby Food products could result in neurodevelopmental disorders—specifically ASD—in children.

f. Defendant Baby Food Manufacturers did not conduct adequate post-marketing surveillance of their Baby Food products; and

g. Defendant Baby Food Manufacturers could have employed safer alternative designs and formulations that their competitors used who did not have high levels, or any level, of Heavy Metals in their baby food products.

88.

Plaintiffs JMW and RAW consumed Defendant Baby Food Manufacturers' Baby Food products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

89.

Defendant Baby Food Manufacturers' Baby Food products were, and are, more dangerous than alternative products, and Defendant Baby Food Manufacturers could have designed their Baby Food products to avoid harm to children. Indeed, at the time Defendants designed the Baby Food products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable. In fact, other baby food manufacturers have much lower or no Heavy Metals in their finished baby food products.

90.

At the time the Baby Food products left Defendant Baby Food Manufacturers' control, there was a practical, technically and economically feasible and safer alternative designs that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendant Baby Food Manufacturers' Baby Foods, as for example, demonstrated by Hain's presentation to the FDA wherein Hain acknowledges the risk posed by specific ingredients in its Baby Foods.

91.

The design defects in Defendant Baby Food Manufacturers' Baby Foods were substantial factors in causing Plaintiffs' injuries.

92.

As a direct and proximate result of the Defendant Baby Food Manufacturers' defective design of the Baby Foods, Plaintiffs have been injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, and other damages.

**COUNT III – PRODUCT LIABILITY – BREACH OF EXPRESS WARRANTY**

93.

Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

94.

Defendant Baby Food Manufacturers' Baby Food products are unreasonably dangerous because they do not, and did not, conform to the express warranty made at all relevant times by the Defendant Baby Food Manufacturers that their product was "baby food."

95.

The express warranty that the Defendant Baby Food Manufacturers' product was "baby food" induced the parents of JMW and RAW to purchase and use the Baby Food as "baby food."

96.

Petitioners' damages were proximately caused because the express warranty that the Baby Food was in fact appropriate to feed to babies was untrue.

97.

In fact, the "food" Defendants sold was more appropriately warranted as rat food and was not healthy or something that a baby should ever ingest as food.

**COUNT IV – PRODUCT LIABILITY – MANUFACTURING DEFECT (SWB)**

98.

Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

99.

SWB sells "treated" water which, upon information and belief, during relevant times was/is contaminated with finished gasoline additive and presumably other finished gasoline compounds.

100.

At the times the "treated water" product left the control of SWB, the contamination with finished gasoline products should have been known to SWB through routine testing.

101.

Plaintiffs, lacking any awareness of the exposure to the contamination, consumed and bathed in the water SWB sold to them, and thus, Plaintiffs were exposed to the contaminated water.

102.

Upon information and belief, the exposure to the finished gasoline contaminated water caused or contributed to Plaintiffs' injuries alleged herein.

**COUNT V – REDHIBITION (Whole Foods and Amazon)**

103.

Whole Foods advertises they are very concerned that the products they sell be healthy and organic and so receive data on the products they sell, including manufacturer testing. Upon information and belief, Whole Foods and Amazon, as the owner of Whole Foods, knew or should have known about the heavy metal levels in the Baby Foods they sold to Plaintiffs, and thus, are bad faith sellers under redhibition law.

104.

Defendants Amazon and Whole Foods, as bad faith sellers of the Baby Food, knew that the Baby Food had a defect, namely it was tainted by high levels of Heavy Metals but omitted to declare it as well as declaring that the Baby Food had a quality that they knew it did not have, namely it is appropriate and healthy baby food.

105.

Petitioners' damages were proximately caused because the presence of Heavy Metals and the declaration/express warranty that the Baby Food was in fact appropriate to feed to babies.

106.

As a direct and proximate result of the Defendants' failure to declare the presence of Heavy Metals in the Baby Foods, Plaintiffs have been injured, sustained severe and permanent injuries, pain, suffering, disability, impairment, loss of enjoyment of life, economic loss and damages including, but not limited to medical expenses, lost income, attorney fees and other damages to be more fully shown at trial of this matter.

**COUNT VI – TORT (Amazon, Whole Foods)**

107.

Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

108.

Amazon and Whole Foods owed Plaintiffs a duty to ensure the contents of the Baby Food they sold was not tainted with undisclosed chemicals which cause injury when ingested.

109.

The primary incentive to purchase baby food from both Whole Foods and Amazon is advertised by both Amazon and Whole Foods to be their concern and active monitoring for wholesomeness and safety through independent testing and evaluation of the products they sell.

110.

Amazon and Whole Foods assumed the duty of ensure the Baby Food products they sold were in fact wholesome and safe.

111.

Amazon and Whole Foods breached their duty to Plaintiffs by failing to properly monitor, test and ensure the Baby Food products they sold to Plaintiffs were wholesome and safe proximately causing the damages complained of herein.

112.

As a result of the aforementioned acts, petitioners sustained injuries, and asserts to the Court that the damages are within the jurisdictional limits of the Court, and which need to be determined by this Court at the trial in the following particulars:

a.) past, present, and future physical pain and suffering;

b.) past, present and future mental anguish and emotional distress;

c.) past, present, and future medical expenses, including medical monitoring;

d.) temporary and/or permanent disability and/or disfigurement;

e.) loss of wages and loss of earning capacity;

f.) economic loss;

g.) loss of consortium;

h.) attorney fees and costs; and

i.) loss of enjoyment of life, past and future.

WHEREFORE, petitioners prays that Defendants be duly cited and served with a copy of the foregoing Petition for Damages, and that after due proceedings had, there be judgment in favor of petitioners and against defendants, for such special and general damages as are reasonable in the premises to be determined by the trier of fact, together with legal interest from date of judicial demand and all costs, including expert witness and attorney fees and all general and equitable relief as deemed necessary and proper by this Honorable Court.

Respectfully Submitted:

By:_____

J. ALEX WATKINS (29472)
PRO SE
39 NEWCOMB BLVD.
NEW ORLEANS, LA  70118
TELEPHONE:  (504) 669-5943
FACSIMILE: (504) 527-8707
ALEX@WATKINSLAWLLC.LAW

**SHERIFF PLEASE SERVE:**

**Amazon.com Sales, Inc.**
Through its agent for service of process:
Corporation Service Company
501 Louisiana Ave.
Baton Rouge, LA 70802

**Sewerage and Water Board of New Orleans**
Through its Chief Executive Director
Ghassan Korban, Executive Director
625 St. Joseph Street
New Orleans, LA 70165

**PLEASE ISSUE FOUR (4) CERTIFIED COPIES OF PETITION AND CITATION FOR LONG ARM SERVICE**

**Plum, PBC** ("Plum") at its principal place of business located at 1485 Park Avenue, Suite 200, Emeryville, California.

**Nurture, Inc.** ("Nurture"), at its principal place of business located at 40 Fulton St, 17th Floor, New York, NY 10038-1850

**Hain Celestial Group, Inc.** ("Hain") at its principal place of business located at 1111 Marcus Ave., Lake Success, NY 11042.

**Whole Foods Market Inc.** ("Whole Foods") at its headquarter in Austin, Texas located at 550 Bowie St. Austin, TX, 78703-4644.

**ATTORNEY'S NAME:**   Watkins, James A 29472
**AND ADDRESS:**       39 Newcomb Blvd. , New Orleans, LA 70118

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
### STATE OF LOUISIANA

**NO: 2022-00903**          **DIVISION: C**          **SECTION: 10**

### WATKINS, MARGARET ET AL

#### Versus

### PLUM, PBC ET AL

### CITATION - LONG ARM

TO:          WHOLE FOODS MARKET INC. ("WHOLE FOODS")

THROUGH:     THE LOUISIANA LONG ARM STATUTE

             AT ITS HEADQUARTER IN AUSTIN, TEXAS, 550 BOWIE ST. , AUSTIN , TX 78703-4644

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

Petition for Damages

a certified copy of which accompanies this citation, or file an answer or other legal pleading in the office of the
Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA, within thirty (30)
days after the filing in the record of the affidavit of the individual attesting to the manner of delivery made through
the "Long Arm Statute" under penalty of default.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may call the New Orleans
Lawyer Referral Service at 504-561-8828. This Referral Service operates in conjunction with the New
Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast
Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the
Parish of Orleans, State of LA February 1, 2022**

**Clerk's Office, Room 402, Civil Courts**          **CHELSEY RICHARD NAPOLEON, Clerk of**
**421 Loyola Avenue**                               **The Civil District Court**
**New Orleans, LA**                                 **for the Parish of Orleans**
                                                    **State of LA**
                                                    **by _____**
                                                    **Don'Dre Spiller, Deputy Clerk**

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ served a copy of the within |
| **Petition for Damages** | **Petition for Damages** |
| ON **WHOLE FOODS MARKET INC. ("WHOLE FOODS")** | ON **WHOLE FOODS MARKET INC. ("WHOLE FOODS")** |
| THROUGH: **THE LOUISIANA LONG ARM STATUTE** | THROUGH: **THE LOUISIANA LONG ARM STATUTE** |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said **WHOLE FOODS MARKET INC. ("WHOLE FOODS")** being absent from the domicile at time of said service. |
| _____ No. _____ | |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | |
| _____ / ENTERED / _____ | Returned the same day |
| PAPER          RETURN | _____ No. _____ |
| _____ / _____ / _____ | Deputy Sheriff of _____ |
| SERIAL NO.    DEPUTY    PARISH | |

**ATTORNEY'S NAME:** Watkins, James A 29472
**AND ADDRESS:** 39 Newcomb Blvd. , New Orleans, LA 70118

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
### STATE OF LOUISIANA

| NO: 2022-00903 | DIVISION: C | SECTION: 10 |
|---|---|---|

### WATKINS, MARGARET ET AL

#### Versus

### PLUM, PBC ET AL

### CITATION - LONG ARM

TO:      HAIN CELESTIAL GROUP, INC. ("HAIN")

THROUGH:      THE LOUISIANA LONG ARM STATUTE

      AT ITS PRINCIPAL PLACE OF BUSINESS, 1111 MARCUS AVE. , LAKE SUCCESS , NY 11042

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

Petition for Damages

a certified copy of which accompanies this citation, or file an answer or other legal pleading in the office of the Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA, within thirty (30) days after the filing in the record of the affidavit of the individual attesting to the manner of delivery made through the "Long Arm Statute" under penalty of default.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may call the New Orleans Lawyer Referral Service at 504-561-8828. This Referral Service operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the Parish of Orleans, State of LA February 1, 2022**

**Clerk's Office, Room 402, Civil Courts**
**421 Loyola Avenue**
**New Orleans, LA**

**CHELSEY RICHARD NAPOLEON, Clerk of**
**The Civil District Court**
**for the Parish of Orleans**
**State of LA**
**by** _____
**Don'Dre Spiller, Deputy Clerk**

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ _____ served a copy of the within | On this _____ day of _____ _____ served a copy of the within |
| **Petition for Damages** | **Petition for Damages** |
| ON **HAIN CELESTIAL GROUP, INC. ("HAIN")** | ON **HAIN CELESTIAL GROUP, INC. ("HAIN")** |
| THROUGH: **THE LOUISIANA LONG ARM STATUTE** | THROUGH: **THE LOUISIANA LONG ARM STATUTE** |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and |
| No. _____ | discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said **HAIN CELESTIAL GROUP, INC. ("HAIN")** being absent from the domicile at time of said service. |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | |
| / ENTERED / | Returned the same day |
| PAPER    RETURN | No. _____ |
| _____/_____/_____ | Deputy Sheriff of _____ |
| SERIAL NO.  DEPUTY  PARISH | |

**ATTORNEY'S NAME:**   Watkins, James A 29472
**AND ADDRESS:**   39 Newcomb Blvd. , New Orleans, LA 70118

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

### STATE OF LOUISIANA

**NO: 2022-00903**         **DIVISION: C**         **SECTION: 10**

**WATKINS, MARGARET ET AL**

**Versus**

**PLUM, PBC ET AL**

### CITATION - LONG ARM

TO:       NURTURE, INC. ("NURTURE") AT ITS PRINCIPAL PLACE OF BUSINESS

THROUGH:   THE LOUISIANA LONG ARM STATUTE

LOCATED AT 40 FULTON ST. , 17TH FLOOR, NEW YORK, NY 10038-1850

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

Petition for Damages

 a certified copy of which accompanies this citation, or file an answer or other legal pleading in the office of the

Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA, within thirty (30)

days after the filing in the record of the affidavit of the individual attesting to the manner of delivery made through

the "Long Arm Statute" under penalty of default.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may call the New Orleans
Lawyer Referral Service at 504-561-8828. This Referral Service operates in conjunction with the New
Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast
Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the
Parish of Orleans, State of LA February 1, 2022**

**Clerk's Office, Room 402, Civil Courts**
**421 Loyola Avenue**
**New Orleans, LA**

**CHELSEY RICHARD NAPOLEON, Clerk of**
**The Civil District Court**
**for the Parish of Orleans**
**State of LA**
**by** _____
**Don'Dre Spiller, Deputy Clerk**

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ served a copy of the within |
| **Petition for Damages** | **Petition for Damages** |
| ON **NURTURE, INC. ("NURTURE") AT ITS PRINCIPAL PLACE OF BUSINESS** | ON **NURTURE, INC. ("NURTURE") AT ITS PRINCIPAL PLACE OF BUSINESS** |
| THROUGH: **THE LOUISIANA LONG ARM STATUTE** | THROUGH: **THE LOUISIANA LONG ARM STATUTE** |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said **NURTURE, INC. ("NURTURE") AT ITS PRINCIPAL PLACE OF BUSINESS** being absent from the domicile at time of said service. |
| _____ No. _____ | |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | Returned the same day |
| / ENTERED / | _____ No. _____ |
| PAPER          RETURN | Deputy Sheriff of _____ |
| ____/_____/_____ | |
| SERIAL NO.    DEPUTY    PARISH | |

**ATTORNEY'S NAME:** Watkins, James A 29472
**AND ADDRESS:** 39 Newcomb Blvd. , New Orleans, LA 70118

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
### STATE OF LOUISIANA

NO: 2022-00903  **DIVISION: C**  **SECTION: 10**

**WATKINS, MARGARET ET AL**

**Versus**

**PLUM, PBC ET AL**

### CITATION - LONG ARM

TO:  PLUM, PBC ("PLUM") AT ITS PRINCIPAL PLACE OF BUSINESS

THROUGH:  THE LOUISIANA LONG ARM STATUTE

LOCATED AT 1485 PARK AVENUE, SUITE 200 , EMERYVILLE, CA

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

Petition for Damages

a certified copy of which accompanies this citation, or file an answer or other legal pleading in the office of the

Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA, within thirty (30)

days after the filing in the record of the affidavit of the individual attesting to the manner of delivery made through

the "Long Arm Statute" under penalty of default.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may call the New Orleans
Lawyer Referral Service at 504-561-8828. This Referral Service operates in conjunction with the New
Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast
Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the
Parish of Orleans, State of LA February 1, 2022**

**Clerk's Office, Room 402, Civil Courts**
**421 Loyola Avenue**
**New Orleans, LA**

**CHELSEY RICHARD NAPOLEON, Clerk of**
**The Civil District Court**
**for the Parish of Orleans**
**State of LA**
**by** _____
**Don'Dre Spiller, Deputy Clerk**

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ served a copy of the within |
| **Petition for Damages** | **Petition for Damages** |
| ON **PLUM, PBC ("PLUM") AT ITS PRINCIPAL PLACE OF BUSINESS** | ON **PLUM, PBC ("PLUM") AT ITS PRINCIPAL PLACE OF BUSINESS** |
| THROUGH: **THE LOUISIANA LONG ARM STATUTE** | THROUGH: **THE LOUISIANA LONG ARM STATUTE** |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and |
| No. _____ | discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating |
| Deputy Sheriff of _____ | HIM/HER the said **PLUM, PBC ("PLUM") AT ITS PRINCIPAL PLACE OF** |
| Mileage: $ _____ | **BUSINESS** being absent from the domicile at time of said service. |
| _____ / ENTERED / _____ | Returned the same day |
| | No. _____ |
| PAPER  RETURN | Deputy Sheriff of _____ |
| _____ / _____ / _____ | |
| SERIAL NO.  DEPUTY  PARISH | |

**ATTORNEY'S NAME:** Watkins, James A 29472
**AND ADDRESS:** 39 Newcomb Blvd. , New Orleans, LA 70118

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
## STATE OF LOUISIANA

NO: 2022-00903            DIVISION: C            SECTION: 10

### WATKINS, MARGARET ET AL

#### Versus

### PLUM, PBC ET AL

### CITATION

TO:            SEWERAGE AND WATER BOARD OF NEW ORLEANS

THROUGH:    ITS CHIEF EXECUTIVE DIRECTOR, GHASSAN KORBAN, EXECUTIVE DIRECTOR

625 ST. JOSEPH STREET, NEW ORLEANS, LA 70165

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

Petition for Damages

a certified copy of which accompanies this citation, or file an answer or other legal pleading within the delay
provided by Civil Code of Procedure Article 1001. The mentioned article is noted on the back of this page for
your reference. You may make your filing in the office of the Clerk of this Court, Room 402, Civil Courts
Building, 421 Loyola Avenue, New Orleans, LA.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may call the New Orleans
Lawyer Referral Service at 504-561-8828. This Referral Service operates in conjunction with the New
Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast
Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the
Parish of Orleans, State of LA February 1, 2022**

**Clerk's Office, Room 402, Civil Courts**
**421 Loyola Avenue**
**New Orleans, LA**

**CHELSEY RICHARD NAPOLEON, Clerk of**
**The Civil District Court**
**for the Parish of Orleans**
**State of LA**
**by** _____
**Don'Dre Spiller, Deputy Clerk**

### SHERIFF'S RETURN
(for use of process servers only)

|  PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ served a copy of the within |
| **Petition for Damages** | **Petition for Damages** |
| ON **SEWERAGE AND WATER BOARD OF NEW ORLEANS** | ON **SEWERAGE AND WATER BOARD OF NEW ORLEANS** |
| THROUGH: **ITS CHIEF EXECUTIVE DIRECTOR, GHASSAN KORBAN, EXECUTIVE DIRECTOR** | THROUGH: **ITS CHIEF EXECUTIVE DIRECTOR, GHASSAN KORBAN, EXECUTIVE DIRECTOR** |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said **SEWERAGE AND WATER BOARD OF NEW ORLEANS** being absent from the domicile at time of said service. |
| _____ No. _____ | |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | |
| _____ / ENTERED / _____ | Returned the same day |
| PAPER          RETURN | _____ No. _____ |
| _____ / _____ / _____ | Deputy Sheriff of _____ |
| SERIAL NO.    DEPUTY    PARISH | |

Civil Code of Procedures

Article 1001

Art. 1001. Delay for answering

A. A defendant shall file his answer within twenty-one days after service of citation upon him, except as otherwise provided by law. If the plaintiff files and serves a discovery request with his petition, the defendant shall file his answer to the petition within thirty days after service of citation and service of discovery request.

B. When an exception is filed prior to answer and is overruled or referred to the merits, or is sustained and an amendment of the petition ordered, the answer shall be filed within fifteen days after the exception is overruled or referred to the merits, or fifteen days after service of the amended petition.

C. The court may grant additional time for answering.

Acts 2021, No. 174, §1, eff. Jan. 1, 2022.

**ATTORNEY'S NAME:**   Watkins, James A 29472
**AND ADDRESS:**          39 Newcomb Blvd. , New Orleans, LA 70118

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
### STATE OF LOUISIANA

| NO: 2022-00903 | DIVISION: C | SECTION: 10 |
|---|---|---|

### WATKINS, MARGARET ET AL

#### Versus

### PLUM, PBC ET AL

#### CITATION

TO:          AMAZON.COM SALES, INC.

THROUGH:   ITS AGENT FOR SERVICE OF PROCESS: CORPORATION SERVICE COMPANY

501 LOUISIANA AVE. , BATON ROUGE, LA 70802

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

Petition for Damages

a certified copy of which accompanies this citation, or file an answer or other legal pleading within the delay provided by Civil Code of Procedure Article 1001. The mentioned article is noted on the back of this page for your reference. You may make your filing in the office of the Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA.

#### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may call the New Orleans Lawyer Referral Service at 504-561-8828. This Referral Service operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

********COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE********

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the Parish of Orleans, State of LA February 1, 2022**

**Clerk's Office, Room 402, Civil Courts**
**421 Loyola Avenue**
**New Orleans, LA**

**CHELSEY RICHARD NAPOLEON, Clerk of**
**The Civil District Court**
**for the Parish of Orleans**
**State of LA**
**by** _____
**Don'Dre Spiller, Deputy Clerk**

---

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ served a copy of the within | On this _____ day of _____ served a copy of the within |
| **Petition for Damages** | **Petition for Damages** |
| ON **AMAZON.COM SALES, INC.** | ON **AMAZON.COM SALES, INC.** |
| THROUGH: **ITS AGENT FOR SERVICE OF PROCESS: CORPORATION SERVICE COMPANY** | THROUGH: **ITS AGENT FOR SERVICE OF PROCESS: CORPORATION SERVICE COMPANY** |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose name and other facts connected with this service I learned by interrogating HIM/HER the said **AMAZON.COM SALES, INC.** being absent from the domicile at time of said service. |
| _____ No. _____ | |
| Deputy Sheriff of _____ | |
| Mileage: $ _____ | Returned the same day |
| / ENTERED / | _____ No. _____ |
| PAPER            RETURN | Deputy Sheriff of _____ |
| ____/_____/_____ | |
| SERIAL NO.      DEPUTY        PARISH | |

Civil Code of Procedures

Article 1001

Art. 1001. Delay for answering

      A. A defendant shall file his answer within twenty-one days after service of citation upon him, except as otherwise provided by law. If the plaintiff files and serves a discovery request with his petition, the defendant shall file his answer to the petition within thirty days after service of citation and service of discovery request.

      B. When an exception is filed prior to answer and is overruled or referred to the merits, or is sustained and an amendment of the petition ordered, the answer shall be filed within fifteen days after the exception is overruled or referred to the merits, or fifteen days after service of the amended petition.

      C. The court may grant additional time for answering.

      Acts 2021, No. 174, §1, eff. Jan. 1, 2022.

FILED

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

2022 FEB 22   PM 12: 32

STATE OF LOUISIANA

NO.   22-903

CIVIL
DISTRICT COURT
DIVISION E

**MARGARET WATKINS WIFE OF/AND JAMES A. WATKINS INDIVIDUALLY AND
ON BEHALF OF THEIR MINOR SONS JMW, RAW AND WJW**

**VERSUS**

**PLUM, PBC; NURTURE, INC.; HAIN CELESTIAL GROUP, INC.; AMAZON.COM
SALES, INC.; WHOLE FOODS MARKET INC.; and SEWERAGE AND WATER
BOARD OF NEW ORLEANS**

FILED: _____    _____
                                                 DEPUTY CLERK

### AFFIDAVIT OF LONG ARM SERVICE

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

BEFORE ME, the undersigned authority, this day personally came and appeared:

**JAMES A. WATKINS**

A person of the full age of majority and resident of and domiciled in the Parish of
ORLEANS, State of LOUISIANA, who, after being duly sworn by me, Notary, did depose and
say:

1. On February 2, 2022, that he shipped via overnight Fedex, signature required, certified
copies of the Citation and Petition for Damages to the following addresses:

   A. Legal Department
      **Plum, PBC**
      1485 Park Avenue, Suite 200
      Emeryville, California 94608-
      3560

   B. Shazi Visram
      **Nurture, Inc.**
      40 Fulton St.
      New York, NY 10038-1850

   C. Legal Department
      **Hain Celestial Group, Inc.**
      1111 Marcus Ave.,
      Lake Success, NY 11042

   D. Legal Department
      **Whole Foods Market Inc.**
      550 Bowie St.
      Austin, TX 78703-4644

2. The four (4) shipping receipts are attached as exhibit 1.

3. The Plum, PBC; Nurture, Inc.; and Hain Celestial Group, Inc. packages were delivered
with signatures received on February 3, 2022, and the Whole Foods Market, Inc. package
was delivered with signature received on February 4, 2022. Signature image for Hain is
not available per Fedex customer service.

4. The four (4) signature confirmations are attached as exhibit 2.

_____
James A. Watkins

SWORN TO AND SUBSCRIBED BEFORE ME THIS 22nd DAY OF February, 2022.

_____
NOTARY PUBLIC



MARGARET M COMSTOCK
Notary Public
State of Louisiana
Orleans Parish
Notary ID # 144314
My Commission is for Life



---

*[The following text appears as overlaid receipt/stamp images in the background:]*

CHELSEY RICHARD NAPOLEON
CLERK CIVIL DISTRICT COURT

421 LOYOLA AVENUE - ROOM 402
NEW ORLEANS, LA 70112
504 - 407 C...
Receipt Date     2/22/2022 12:36:00 PM
Receipt Number   000000
Cashier          CDC Cash Register 7
Register         CDC Cash Register 7
Case Number      2022-00903
Grand Total
Amount Rec       $16.00
Balance Due      $ 0.00
Change Due       $ 4.00
Payment / Transaction List

| Item | Charged | Paid | Bal |
|------|---------|------|-----|
| Affidavit of Service | $0.00 | $0.00 | $0.00 |
| Exhibits (Paper) | $16.00 | $16.00 | $0.00 |

**FedEx.**   Shipment Receipt

FILED

700 SEP 22  PM 12: 32

CIVIL
DISTRICT COURT

**Address Information**

**Ship to:**
Legal Department
Plum, PBC
1485 PARK AVE
STE 200
EMERYVILLE, CA
94608-3560
US
(877) 914-7586

**Ship from:**
James A. Watkins

39 Newcomb Blvd

New Orleans, LA
70118
US
3236467380

**Shipment Information:**
Tracking no.: 775933601132
Ship date: 02/02/2022
Estimated shipping charges:  65.25 USD

**Package Information**
Pricing option: FedEx One Rate
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight:
Declared Value: 0.00  USD
Special Services: Adult signature required
Pickup/Drop-off: Drop off package at FedEx location

**Billing Information:**
Bill transportation to: MyAccount-356
Your reference:
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with **FedEx ShipManager** at fedex.com.

**Please Note**
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

VERIFIED

Ex 1

**FedEx** Shipment Receipt

## Address Information

**Ship to:**
Shazi Visram
Nurture, Inc.
40 FULTON ST

NEW YORK, NY
10038-1850
US
(212) 374-2779

**Ship from:**
James A. Watkins

39 Newcomb Blvd

New Orleans, LA
70118
US
3236467380

## Shipment Information:

Tracking no.: 775933623880
Ship date: 02/02/2022
Estimated shipping charges: 65.25 USD

## Package Information

Pricing option: FedEx One Rate
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight:
Declared Value: 0.00 USD
Special Services: Adult signature required
Pickup/Drop-off: Drop off package at FedEx location

## Billing Information:

Bill transportation to: MyAccount-356
Your reference:
P.O. no.:
Invoice no.:
Department no.:

---

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

---

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

**FedEx**   Shipment Receipt

**Address Information**

**Ship to:**
Legal Department
Hain Celestial Group, Inc.
1111 Marcus Avenue

LAKE SUCCESS,  NY
11042
US
5165875000

**Ship from:**
James A. Watkins

39 Newcomb Blvd

New Orleans,  LA
70118
US
3236467380

**Shipment Information:**
Tracking no.: 775933638449
Ship date: 02/02/2022
Estimated shipping charges: 65.25 USD

**Package Information**
Pricing option: FedEx One Rate
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight:
Declared Value: 0.00  USD
Special Services: Adult signature required
Pickup/Drop-off: Drop off package at FedEx location

**Billing Information:**
Bill transportation to: MyAccount-356
Your reference:
P.O. no.:
Invoice no.:
Department no.:

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

**FedEx**   Shipment Receipt

**Address Information**

**Ship to:**
Legal Department
Whole Foods Market, Inc.
550 Bowie Street

AUSTIN, TX
78703-4644
US
512-477-4455

**Ship from:**
James A. Watkins

39 Newcomb Blvd

New Orleans, LA
70118
US
3236467380

**Shipment Information:**
Tracking no.: 775933658668
Ship date: 02/02/2022
Estimated shipping charges: 53.95 USD

**Package Information**
Pricing option: FedEx One Rate
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight:
Declared Value: 0.00  USD
Special Services: Adult signature required
Pickup/Drop-off: Drop off package at FedEx location

**Billing Information:**
Bill transportation to: MyAccount-356
Your reference:
P.O. no.:
Invoice no.:
Department no.:

---

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

**FedEx.**

Dear Customer,

FILED

February 03, 2022

The following is the proof-of-delivery for tracking number: 775933638449

2022 FEB 22  PM 12: 32

CIVIL
~TRICT COURT

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Receptionist/Front Desk |
| **Signed for by:** | G.GUCCI | **Delivery Location:** | 1111 MARCUS AVE |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday; Adult Signature Required | | LAKE SUCCESS, NY, 11042 |
| | | **Delivery date:** | Feb 3, 2022 12:49 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 775933638449 | **Ship Date:** | Feb 2, 2022 |
| | | **Weight:** | 1.0 LB/0.45 KG |

**Recipient:**
Legal Department, Hain Celestial Group, Inc.
1111 Marcus Avenue
LAKE SUCCESS, NY, US, 11042

**Shipper:**
James A. Watkins,
39 Newcomb Blvd
New Orleans, LA, US, 70118

Signature Proof of Delivery is not currently available for this Tracking Number.  Availability of signature
images may take up to 5 days after delivery date. Please try later, or contact Customer Service at
1.800.Go.FedEx(R) 800.463.3339.

VERIFIED

Thank you for choosing FedEx

Ex 2

February 03, 2022

Dear Customer,

The following is the proof-of-delivery for tracking number: 775933601132

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Receptionist/Front Desk |
| **Signed for by:** | E.THOMPSON | **Delivery Location:** | 1485 PARK AVE 200 |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday; Adult Signature Required | | EMERYVILLE, CA, 94608 |
| | | **Delivery date:** | Feb 3, 2022 09:25 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 775933601132 | **Ship Date:** | Feb 2, 2022 |
| | | **Weight:** | 1.0 LB/0.45 KG |

**Recipient:**
Legal Department, Plum, PBC
1485 PARK AVE
STE 200
EMERYVILLE, CA, US, 94608

**Shipper:**
James A. Watkins,
39 Newcomb Blvd
New Orleans, LA, US, 70118



Thank you for choosing FedEx

February 03, 2022

Dear Customer,

The following is the proof-of-delivery for tracking number: 775933023880

| Delivery Information: | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Receptionist/Front Desk |
| **Signed for by:** | F.HERNÁNDEZ | **Delivery Location:** | 40 FULTON 19 |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday;<br>Adult Signature Required | | NEW YORK, NY, 10038 |
| | | **Delivery date:** | Feb 3, 2022 12:20 |

| Shipping Information: | | | |
|---|---|---|---|
| **Tracking number:** | 775933623880 | **Ship Date:** | Feb 2, 2022 |
| | | **Weight:** | 1.0 LB/0.45 KG |

**Recipient:**
Shazi Visram, Nurture, Inc.
40 FULTON ST
NEW YORK, NY, US, 10038

**Shipper:**
James A. Watkins,
39 Newcomb Blvd
New Orleans, LA, US, 70118



Thank you for choosing FedEx

**FedEx**                                                    February 06, 2022

Dear Customer,

The following is the proof-of-delivery for tracking number: 775933658668

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Mailroom |
| **Signed for by:** | S.WARNER | **Delivery Location:** | 550 BOWIE ST |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday;<br>Adult Signature Required | | AUSTIN, TX, 78703 |
| | | **Delivery date:** | Feb 4, 2022 13:15 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 775933658668 | **Ship Date:** | Feb 2, 2022 |
| | | **Weight:** | 1.0 LB/0.49 KG |

**Recipient:**
Legal Department, Whole Foods Market, Inc.
550 Bowie Street
AUSTIN, TX, US, 78703

**Shipper:**
James A. Watkins,
39 Newcomb Blvd
New Orleans, LA, US, 70118



Thank you for choosing FedEx

FILED

2022 FEB 23  P 02:56

CIVIL

DISTRICT COURT

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

NO. 22-903                                    DIVISION "C-10"

MARGARET WATKINS WIFE OF/AND JAMES A. WATKINS INDIVIDUALLY AND
ON BEHALF OF THEIR MINOR SONS JMW, RAW AND WJW

VERSUS

PLUM, PBC; NURTURE, INC.; CELESTIAL GROUP, INC.; AMAZON.COM
SALES INC.; WHOLE FOODS MARKET INC.; and SEWERAGE AND WATER
BOARD OF NEW ORLEANS

FILED:_____        _____
                                              **DEPUTY CLERK**

**WHOLE FOODS MARKET INC.'S**
**MOTION AND ORDER FOR EXTENSION OF TIME**

NOW INTO COURT, through undersigned counsel, comes defendant, Whole Foods
Market Inc. ("Whole Foods" or "Defendant"), and, with a full reservation of rights, moves the
Court for an extension of time within which to respond to the Petition for Damages filed by
Plaintiffs. Defendant respectfully suggests that additional time is needed to investigate the claim
and to gather the information necessary to file its responsive pleading. Therefore, Defendant
requests an additional thirty (30) days, or until and including Friday, March 25, 2022, within
which to gather information and properly respond to the Petition.

Undersigned counsel represents that he requested an extension from counsel for the
Plaintiffs, and Plaintiffs' counsel has no objection to the request. Whole Foods further
represents that the extension of time will not delay this matter and that Whole Foods has not
previously moved the Court for an extension to respond to the Petition.

Considering the foregoing,

**IT IS ORDERED** that the motion by defendant, Whole Foods Market Inc., for an
extension of time to file responsive pleadings in this matter be and hereby is granted, and that
Whole Foods Market Inc. has through and including Friday, March 25, 2022, within which to
respond to the Petition for Damages filed by Plaintiffs.

New Orleans, Louisiana, this _____ day of _____, 2022.

                                    _____
                                                 J U D G E

VERIFIED

Jovan Gibson

2022 FEB 24   A 08:35

4854-0731-9568v1
2922176-000141 02/23/2022

E-Filed

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

STEVEN F. GRIFFITH, JR (#27232)
BRIAN M. BALLAY (#29077)
ALEX RYCHLAK (#37612)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000

**ATTORNEYS FOR DEFENDANT,
WHOLE FOODS MARKET INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2022, I served a copy of the foregoing Motion for

Extension of Time on Plaintiffs' counsel by electronic mail.

BRIAN M. BALLAY

2022 FEB 23  P 02:56

CIVIL

DISTRICT COURT

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
## STATE OF LOUISIANA

NO. 22-903                                                           DIVISION "C-10"

### MARGARET WATKINS WIFE OF/AND JAMES A. WATKINS INDIVIDUALLY AND ON BEHALF OF THEIR MINOR SONS JMW, RAW AND WJW

#### VERSUS

### PLUM, PBC; NURTURE, INC.; CELESTIAL GROUP, INC.; AMAZON.COM SALES INC.; WHOLE FOODS MARKET INC.; and SEWERAGE AND WATER BOARD OF NEW ORLEANS

FILED:_____                 _____
                                                            **DEPUTY CLERK**

### WHOLE FOODS MARKET INC.'S
### MOTION AND ORDER FOR EXTENSION OF TIME

NOW INTO COURT, through undersigned counsel, comes defendant, Whole Foods Market Inc. ("Whole Foods" or "Defendant"), and, with a full reservation of rights, moves the Court for an extension of time within which to respond to the Petition for Damages filed by Plaintiffs. Defendant respectfully suggests that additional time is needed to investigate the claim and to gather the information necessary to file its responsive pleading. Therefore, Defendant requests an additional thirty (30) days, or until and including Friday, March 25, 2022, within which to gather information and properly respond to the Petition.

Undersigned counsel represents that he requested an extension from counsel for the Plaintiffs, and Plaintiffs' counsel has no objection to the request.   Whole Foods further represents that the extension of time will not delay this matter and that Whole Foods has not previously moved the Court for an extension to respond to the Petition.

Considering the foregoing,

**IT IS ORDERED** that the motion by defendant, Whole Foods Market Inc., for an extension of time to file responsive pleadings in this matter be and hereby is granted, and that Whole Foods Market Inc. has through and including Friday, March 25, 2022, within which to respond to the Petition for Damages filed by Plaintiffs.

New Orleans, Louisiana, this 24th day of February, 2022.

_____
JUDGE Sidney H Cates, IV

**VERIFIED**

Jovan Gibson

2022 FEB 24  A 08:35

4854-0731-9568v1
2922176-000141 02/23/2022

E-Filed

FILED

2022 FEB 28  AM 10: 40

FILED ON BEHALF OF SEWERAGE AND WATER BOARD OF NEW ORLEANS
GOVERNMENT – COURT COSTS DEFERRED – LA. R.S. 13:4521
CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

NO. 2022-00903                    DIVISION: "C"                    SECTION: 10

WATKINS, MARGARET ET AL

VERSUS

PLUM, PBC ET AL

FILED: _____, 2022    _____
                                                    **DEPUTY CLERK**

## MOTION FOR EXTENSION OF TIME WITHIN WHICH TO FILE RESPONSIVE PLEADINGS

**ON MOTION** of defendant Sewerage and Water Board through undersigned counsel, appearing solely for the purpose of this Motion, and on suggesting to the Court that the time for answering Plaintiff's Petition for Damages in the above captioned matter will expire on February 28, 2022, and that counsel for mover herein will need additional time within which to investigate this matter.

Defendant requests an additional thirty (30) days, or until March 30, 2022, within which to file responsive pleadings in the matter.

Respectfully submitted,

**CHANELLE L. COLLINS, ATTORNEY III (LSBA #36832)**
**SEWERAGE AND WATER BOARD OF NEW ORLEANS**
625 ST. JOSEPH STREET, ROOM 201
NEW ORLEANS, LA 70165
EMAIL:        ccollins@swbno.org
TELEPHONE: 504-585-2250
FACSIMILE: 504-585-2426

**DARRYL HARRISON, DEPUTY SPECIAL COUNSEL**
**YOLANDA Y. GRINSTEAD, SPECIAL COUNSEL**



1

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the above and foregoing Motion for Extension of Time Within Which to File Responsive Pleadings on Behalf of Sewerage and Water Board of New Orleans has been served on all known counsel of record, either by facsimile, e-mail or by depositing a copy of same in the United States mail, postage prepaid and properly addressed, this 24th day of February _____ 2022.

CHANELLE L. COLLINS, ATTORNEY III (LSBA #36832)
SEWERAGE AND WATER BOARD OF NEW ORLEANS

2

FILED

2022 FEB 23 AM 10: 40

CIVIL
**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS** DISTRICT
**STATE OF LOUISIANA**

NO. 2022-00903          **DIVISION: "C"**          **SECTION: 10**

**WATKINS, MARGARET ET AL**

**VERSUS**

**PLUM, PBC ET AL**

**FILED:** _____, 2022          _____
                                                      **DEPUTY CLERK**

**ORDER**

Considering the foregoing, *Motion for Extension of time Within Which to File Responsive Pleadings,*

   **IT IS ORDERED** that defendant, Sewerage and Water Board of New Orleans, be allowed an additional thirty (30) days, or until March 30, 2022, to file responsive pleadings in this matter.

   New Orleans, Louisiana, this _____ day of _____ 2022.


                                        _____
                                        **HONORABLE SIDNEY H. CATES IV**

3

